FILED
JAMES BONINI
CLERK

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO** DEC 31  AM 9: 24
**EASTERN DIVISION**

U.S. ___ ___ COURT
SOUTHERN ___ T OHIO

| | |
|---|---|
| **LUCINDA S. ARNOLD**<br>131 Rauch Drive<br>Marietta, Ohio 45750<br><br>And<br><br>**FRED J. ARNOLD**<br>131 Rauch Drive<br>Marietta, Ohio 45750<br><br>Plaintiffs,<br><br>v.<br><br>**PETLAND, INC.**<br>250 Riverside Street<br>Chillicothe, Ohio 45601<br><br>And<br><br>**HUNTE KENNEL SYSTEMS &**<br>**ANIMAL CARE, INC.**<br>c/o Registered Agent John R. Lightner<br>1949 E. Sunshine, Ste 2-102<br>Springfield, Missouri 65804<br><br>And<br><br>**HUNTE DELIVERY SYSTEM, INC.**<br>c/o Andrew Hunte<br>121 N. Royhill Blvd.<br>Goodman, Missouri 64843<br><br>Defendants. | ) CASE NO. **2:07-cv-1307**<br>)<br>) JUDGE   **JUDGE SARGUS**<br>)<br>) **COMPLAINT**   MAGISTRATE JUDGE KEMP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Now come Plaintiffs, Lucinda S. Arnold and Fred J. Arnold (hereinafter referred to

collectively as "the Arnolds," "Plaintiffs" or individually by name), and for their Complaint

against Defendants Petland, Inc. (referred to as "Petland"), Hunte Kennel Systems & Animal Care, Inc. and Hunte Delivery System, Inc. (collectively referred to as "Hunte"), state as follows:

## PARTIES

1. At all times relevant, the Arnolds had a partnership organized and existing under the laws of the State of Ohio with its principal place of business in Marietta, Ohio, and created for the sole purpose of opening and operating a Petland franchise. The Marietta Petland retail store, the subject matter of this litigation, was located at Rivers Edge Shopping Center, 239 Captain D. Seeley MIA Drive, Marietta, Ohio 45750.

2. At all times relevant, Petland is an Ohio corporation that maintains its principal place of business at 250 Riverside Street, Chillicothe, Ohio. Petland is in the retail pet industry, specializing in the sale of pets and pet supplies. In addition, Petland franchises its pet supply business to franchisees both within, and without, Ohio.

3. At all times relevant, Hunte's principal place of business is in Missouri. Hunte is in the business of supplying puppies to pet stores and, for all relevant purposes here, is a preferred supplier of puppies to Petland, and supplied the puppies the subject matter of the allegations against Hunte in this Complaint.

## JURISDICTION & VENUE

4. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332(a)(1), in that this is a civil action where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states (Defendant Hunte's primary place of business is in Missouri).

5.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2), in that a substantial part of the events or omissions giving rise to the claims herein occurred in this District.  Moreover, the Arnolds and Petland specifically contractually consented to suit in this District in a forum selection clause in the parties' Franchise Agreement, §28, page 36.  (*See* Franchise Agreement attached hereto as Exhibit A, and referred to hereinafter as "Franchise Agreement.")

## FACTS

6.     The Arnolds incorporate and reallege the allegations of paragraphs 1 through 5 as if fully set forth herein.

7.     On or about 2004, the Arnolds first became aware of an investment opportunity in Petland when they saw an advertisement in a Marietta newspaper regarding the opening of a Petland franchise there. Responding to that advertisement, and after speaking with Petland representatives regarding that opportunity, the Arnolds decided that the new, from-the-ground-up franchise was not a good investment for them because it required an initial $750,000 to $850,000 up-front capital outlay, and they thus did not pursue that opportunity further.  Nevertheless, Petland went ahead and built the store, at the corporate level, and ran it as a corporate store for a period of time until a franchisee was eventually found to take the operation over.

8.     Approximately two years later, and in November 2006, the franchisee that took over the Marietta Petland store from Petland corporate closed the store's doors. While that franchise was struggling, Petland corporate contacted the Arnolds, out of the blue, regarding purchasing the Marietta Petland store for over $400,000.00.  The Arnolds made what they believed to be a reasonable offer, which offer was refused.  Then, approximately a month later,

Petland representative Jimmy Taylor contacted the Arnolds again regarding purchasing the Marietta Petland *franchise* – now an existing, turn-key operation.

9. Following several months of back-and-forth due diligence between the Arnolds and Petland, the Arnolds decided that, this time around, the franchise opportunity for which they were solicited by Petland might work for them, economically. This was based upon the fact that, at least as of November 2006, the store's financials appeared to show that the franchise could be operated profitably, and was otherwise represented to the Arnolds as being "ready to open" with only a $20,000 to $25,000 inventory investment.

10. Following Petland's three months of courting the Arnolds, and on or about February 28, 2007, the Arnolds went ahead and entered into a Franchise Agreement with Petland. Although the Arnolds did not know it at that time, Petland had misled them into entering into that Agreement by providing them false, and/or materially misleading information regarding the Marietta store including, but not limited to:

> a) False and/or inaccurate and misleading information regarding the true start-up costs to open the Marietta Petland store consistent with Petland requirements/protocols;
>
> b) False and/or inaccurate and misleading information regarding the finances, profits and losses of the immediately-preceding franchisee of the same store;
>
> c) False and/or inaccurate and misleading information regarding the reasons why the prior franchisee had failed to succeed in the same store location;
>
> d) False and/or inaccurate and misleading information regarding the ventilation/air conditioning system servicing the Marietta store's kennels, and

- 4 -

which systems were critical to maintaining the health of the pets kept and quarantined there;

e)  False and/or inaccurate and misleading information regarding the usable shelf-life of the substantial inventory already then on the store's shelves at the Arnold's restart-up of the franchise; and

f)  False and/or inaccurate and misleading information regarding the functionality of the Point-of-Sale ("POS") data system servicing the Marietta store.

These false, inaccurate, misleading and material misrepresentations regarding the business worth, potential, and functionality of the Marietta store ultimately frustrated the very purposes of that franchise for the Arnolds and, despite their best efforts to make the Marietta Petland store a success, proximately, inevitably and irreversibly led to its failure, and ultimate closing on October 13, 2007.

11.     Unaware of the falsity, inaccuracy, misleading nature and materiality of these misrepresentations, the Arnolds, nevertheless, were induced by Petland to purchase the franchise on or about February 28, 2007 (*See* Franchise Agreement, Exhibit A).  Therein, the Franchise Agreement required the Arnolds to pay an initial franchise fee of $12,500.00 (Franchise Agreement, § 5(A)(ii), p. 6). The accompanying Asset Purchase Agreement required them to pay an additional $110,500.00 for the store's fixtures, equipment, existing inventory, and related assets (*See* Exhibit B, Asset Purchase Agreement, Petland Marietta, Marietta, Ohio).

12.     Upon the express "professional" advice and consultation of Petland's agents, servants, and/or employees, the Arnolds paid approximately $50,000.00 in *additional* out-of-pocket expenses for *other* inventory, and *other* expenses, not contemplated by the parties – and

- 5 -

not by the Arnolds particularly – to open the Marietta Petland.  Over the next six (6) months, after the opening, the Arnolds spent approximately $50,000.00 *more* to keep the store open.

13.     Unaware of all of the above, and on or about March 5, 2007, the Arnolds attended a "Training Week" at Petland's headquarters in Chillicothe, Ohio.  There, they were informed that their franchise's Grand Opening date was going to be moved up to March 31, 2007 – several weeks earlier than initially represented to the Arnolds, and quicker than the ordinary and customary *weeks* a new franchisee was usually afforded to open a store by Petland.  In that regard Petland, specifically and expressly, told the Arnolds that the quick Grand Opening date would "not be a problem" specifically because the Marietta store was essentially a turn-key operation.  In that regard, the Arnolds were told that "all" that was required of them to be operational at opening was for them to complete a punch-list of items required by Petland (i.e. ordering utility services), order supplementary inventory (as there allegedly already was substantial inventory in the store left by the prior franchisee), and order actual animals – pets – for sale to the public.  Despite these representations, and as the Arnolds later discovered, Petland's *true* motivation for pushing them into the store – before it was ready – was that Petland had negotiated an agreement with its landlord to defer Petland's $6,750.00 monthly rent on the property until April 1, 2007.

14.     After Petland corporate, itself, placed the initial order(s) for pet food/inventory for the Arnolds' Grand Opening through Petland's preferred suppliers, and also placed the first order of puppies for the Grand Opening through its preferred supplier, Defendant Hunte (hereinafter "Hunte puppies") – located three states away in Missouri – the Arnolds held their Grand Opening on March 31, 2007, as requested by Petland corporate.  At that time, and continuing from the very outset, a number of the Hunte puppies were already sick.  Unbeknownst to the

Arnolds, these sick puppies, purchased by eager customers, were returned just days later exhibiting various symptoms of disease. In fact, two of the very first puppies sold to the public from the initial order of Hunte puppies died from parvo and/or viral enteritis within days of sale. A third puppy from the initial Hunte order, which was never sold, became very ill and also passed away. Those that did not die, or were not sold, soon also showed symptoms of illness, and had to be taken to a veterinarian – at the Arnolds' considerable, and uncontemplated expense – and/or were placed into isolation kennels at the Marietta Petland store (and which kennels were later found to be defective for that very purpose).

15.    In addition to the sick and/or dying and dead Hunte puppies, the pet food in the Marietta store's existing inventory soon also began to be returned to the store – for full refund(s) – as being expired. In addition, other food was returned for the presence of maggots. This was all despite the fact that Petland had expressly, and unequivocally, represented to the Arnolds that the substantial inventory in the store was merchantable and saleable.

16.    Cash returns for sick puppies and expired/contaminated pet food continued from the Grand Opening – the very first day of business – into and through late April and early May. This unforeseen and not bargained-for commercial frustration devastated the Arnold's "bottom line" for the store, as 55% of contemplated (but never realized) profits were represented (by Petland) to come from the sale of puppies, and with the majority of the remaining profit to come from the sale of pet food. Thus the Arnolds' sick, dying and dead dogs, unanticipated and substantial veterinarian bills, and cash refunds for unmerchantable pet food significantly and proximately harmed the store's bottom line, and reputation in the community, so quickly and completely that the very purposes of the franchise were irretrievably frustrated by Petland's

wrongdoing from day one. Because of Petland, the Arnold's dream of a successful franchise was doomed before it even began.

17. Ultimately, and on top of the myriad other failures by defendant Petland that ultimately led to the Arnolds' forced closure of their franchise, the proverbial "last straw" was the utter failure of the POS system, which never worked properly during the seven-plus months that the store was open.

18. In that regard and, during the merchandising of the store, Petland representative Ryan Hamel told the Arnolds that they needed to overnight the back register for the store to Dunn & Dunn, in Florida, prior to the Grand Opening. After the Arnolds did this, at their cost of $450.00, the register and POS system continued to fail to work properly. When Hamel was later questioned by the Arnolds regarding what, actually, Dunn & Dunn did to the register, Hamel replied that "all they did was re-load WINDOWS on the register. Unfortunately, this did not fix it". While the Arnolds did, in fact, solicit quotes for replacement of the entire POS system within months of opening, they did not have the money to do so, and continued to use the system that defendant had sold them – and had represented to the Arnolds – as being in working order. By October 13, 2007, the system had again crashed several times that day, and was not accepting credit card transactions after 8:00 p.m.

19. As a proximate result of all of the above, and despite the Arnolds' best efforts, by September 2007, the Arnolds' Petland franchise was in deep financial trouble.

20. Accordingly, and in September 2007, the Arnolds contacted Petland for financial and other assistance and, specifically, for some form of operating loan from Petland's "preferred lenders" to keep the store afloat. The Arnolds did so because, during the negotiations to purchase the franchise, Petland told the Arnolds that Petland "has a great relationship" with several

"preferred lenders", and that "based on [our] superior credit rating", the Arnolds would be able to obtain financing if needed. This, also, turned out not to be the case.

21.    Caught in a proverbial "Catch 22", the store's initial and early failure(s) made it (apparently) not risk-worthy to Petland's "preferred lenders". This was despite the fact that the Arnolds' economic hardships were proximately caused by Petland, itself, and as detailed above. Nevertheless, the Arnolds were told by Greg Hudson, Petland COO, that no financial assistance would be provided to them by Petland. In fact, and to the contrary, Mr. Hudson's advice to the Arnolds was to "stop paying their vendors", to "only worry" about "paying the bank, your landlord, and Petland", and to heed the threat that "[Petland] would eat you for lunch" if the Arnolds stopped paying the franchise-related fees to it (specifically, the Arnolds asked Hudson for help on the rent, and the 4.5% royalty fees taken on a weekly basis – two major expenses in Petland's control that could have provided the Arnolds immediate, and direct, financial relief). Hudson's threats came despite the fact that Petland representative Jim Whitman had told the Arnolds that he would "see what he could do" regarding lowering both the rent and royalty fees. Later, however, Whitman recanted and admitted that he "didn't have any authority to make those statements".

22.    While the Arnolds continued to ask for assistance from Petland, Petland instead cut-off all communications with them. Phone calls went unreturned, and e-mails, imploring assistance, were ignored.

23.    On October 13, 2007, the Arnolds were finally, financially, forced to shut the doors of the Marietta Petland store. In that short of time, the franchise had no "good will", no customers, and thus no profits.

24.     As stated above, the Arnolds were materially misled by Petland and induced into entering the Franchise Agreement (and concomitant Asset Purchase Agreement) with Petland through, among other things, false, misleading and/or incorrect financial information from Petland. Specifically, and while the Arnolds were expressly informed by Petland that they (the Arnolds) would only require $20,000.00 to $25,000.00 of additional inventory to open the store, Petland knowingly failed to disclose to the Arnolds that this amount did not include the animals, which cost the Arnolds an additional, and unanticipated, $25,000.00. This misrepresentation, obviously, was made to the Arnolds to, among other things, induce them to take over Petland's lease payments for the property as soon as possible. In addition, Petland provided the Arnolds with false and/or inaccurate and misleading information regarding the financial condition and performance of their (the Arnolds') immediate-predecessor franchisee, and upon which misrepresentations the Arnolds relied to their extreme detriment.

25.     Specifically, and as was discussed with Jimmy Taylor (paragraph 8 above), the Arnolds were repeatedly told by Petland that the last two months of the prior franchisee's business had been that prior franchisee's "strongest months", and that Petland "did not understand" why that prior franchisee "walked away" at that time. In support of those statements, Petland agents, servants, and/or employees told the Arnolds that the last two (2) months' financials of the prior franchisee were "very strong", and that Petland would produce those financials to them (the Arnolds). After Petland failed to do so, and after the Arnolds took possession of the POS system (and ran the reports themselves), they later discovered that Petland's representations in these regards were well below what had been represented to them (i.e., false).

- 10 -

26.     The Arnolds were also provided with false and/or inaccurate and misleading information with respect to the operational status of the store. In this regard, Petland agents, servants, and/or employees represented the store to the Arnolds as "being ready" for the Grand Opening. In actuality, however, the ventilation and air conditioning system(s) serving the property was defective, and Petland *knew* that it was defective before it sold the Arnolds this franchise. Ultimately, the defective ventilation/air conditioning system proximately caused, and/or greatly exacerbated the problems with the sick Hunte puppies, and further proximately caused the business's inevitable decline by frustrating its very purpose – to sell healthy puppies and consumable pet food.

27.     Specifically, and prompted by a prior e-mail from the Arnolds to Petland representative Brian Winslow regarding the sick Hunte puppies, Winslow recalled to the Arnolds: "Let's see, as I recall, the store had an issue with the ventilation/air conditioning system. Have you and Fred corrected that issue?" Mr. Winslow specifically noted that the kennel "should have negative pressure." Taken by complete surprise in that regard, the Arnolds replied that they weren't aware of any such problem. Shortly after that conversation, and after having spoken with, among others, several other tenants in the shopping strip, the Arnolds learned that the previous franchisee had, in fact, not only discussed this problem with Petland corporate, but with the building owner as well. Following up on this information, the Arnolds reviewed the original plans and noted that, indeed, their space did not have the air conditioning/ventilation specified.

28.     As stated above, the Arnolds were also provided by Petland with false and/or inaccurate and misleading information regarding the state of the then-current inventory, and

specifically the fact that thousands of dollars of pet food on the shelves had expired, and some was even contaminated with maggots, making it unmerchantable and worthless.

29. Specifically, and prior to opening, Petland merchandising representative Ryan Hamel had told the Arnolds' inventory control manager, Tiffany Ritchie, that she "should not worry" about expired and/or expiring merchandise already in the store, as "the vendors will be in and take care of their own merchandise, and you should concentrate on training". It was only after customers starting returning expired merchandise for cash refunds that the Arnolds learned of this conversation, and which representations (of Hamel) were false.

30. In addition, the Arnolds were further provided by Petland with false and/or inaccurate and misleading information regarding the reasons for why the prior franchisee had, in the same location, failed to succeed in his efforts. Specifically, Petland told the Arnolds that the prior failure was due to "poor management", rather than problems with puppy supply sickness and disease, inadequate ventilation, and a defective POS system in the Marietta store. All of these problems were known to Petland, but not disclosed to the Arnolds, before the Arnolds purchased their Petland franchise.

31. Specifically, and only after the Arnolds hired the former franchisee's kennel manager, Stacy McCurdy, did they learn that the myriad problems with the prior franchise were not from that prior franchisee's "mismanagement", but from Petland's lack of support of him. In fact, Ms. McCurdy told the Arnolds that "that's why they [Petland] kept us from talking to you until after you had purchased the store and hired us . . . that way we couldn't tell you all the problems". In fact, after the previously-existing ventilation problems were discussed by the Arnolds with Petland representative J.R. Harper, he denied any knowledge of them. To the contrary, however, McCurdy told the Arnolds that not only did the prior franchisee discuss those

- 12 -

problems with Petland Corporate on several occasions, but also discussed them with J.R. Harper specifically, with Ms. McCurdy present!

32.     Petland used all of this inaccurate information to induce the Arnolds into the Franchise Agreement.  Thereafter, Petland continued to use false and inaccurate information in its performance – or lack thereof – of the Franchise Agreement.

33.     Based on information and belief, the fraudulent and reckless practices described above are particularly egregious given that the Arnolds' personal experience of Petland's "sign-up and shut-down" modus operandi appears to be a concerted scheme to defraud franchisees while reaping excessive, punitive, and penalizing profits through the extortion of unlawful liquidated damages against unwitting – and soon financially broke – franchisees. *Petland, Inc. v. Hendrix*, (2005, S.D. Ohio) 2005 WL 1651723.  According to other Petland franchisees, only recently contacted by the Arnolds, Petland has essentially done the same thing to them – "repossess and flip".  In that regard Petland's tying agreement with Hunte, which provided the Arnolds with the sick and dying puppies – again, unmerchantable and worthless to the Arnolds – also frustrated the very purposes of their franchise under this apparently concerted scheme.

## CLAIMS FOR RELIEF

### COUNT I—FRAUD

34.     Plaintiffs reallege and incorporate paragraphs 1 through 33 as if restated in full herein.

35.     Starting with the preliminary discussions regarding the purchase of the Marietta Petland franchise, and again during the March 5, 2007 training week in Chillicothe, Petland's agents, servants, and/or employees, including (but not limited to) J.R. Harper, Brian Winslow, Jim Whitman and Tony Neff made material misrepresentations to the Arnolds regarding the

Marietta Petland store upon which the Arnolds relied, to their great detriment.  For example, Jim Whitman told the Arnolds "what a deal you have with the Marietta store, you'll do $1.5 million, that's what it's projected to do.  The previous franchisees were horrible to work with.  You have a 'diamond in the rough' and should do very well at this location".  In addition, Petland told the Arnolds that:

        a)  the Marietta store was ready for the Grand Opening;

        b)  that there was saleable inventory (pet food) on the shelves left by the prior franchisees;

        c)  that the Arnolds would only need to spend approximately $20,000.00 to $25,000.00 increase inventory for the Grand Opening of the Marietta Petland; and

        d)  that the Point of Sale system was operational.

36.     These representations, and misrepresentations, were false.

37.     Specifically, and at both the pre-opening walk through with Petland representative Jimmy Taylor, and thereafter at corporate training, the Arnolds were repeatedly told by Petland agents, servants, and/or employees that the Marietta store was essentially ready for business.  In that regard, and when they first arrived at corporate training in Chillicothe on March 5, 2007, for "fast track" training, they were nearly immediately pulled from that training into a 9:00 a.m. meeting with Petland representatives Brian Winslow and J.R. Harper.  It was during this meeting that Winslow informed the Arnolds that their Grand Opening date was being moved up to March 31, 2007.  When the Arnolds expressed concerns about being overwhelmed, and unprepared, for this date, Winslow stated that Petland "had it all planned out".  In that regard Winslow represented that Petland would "provide" the merchandising team, order all of the necessary inventory, and "prepare" the store while the Arnolds concentrated on the "punch list" and hiring

employees. Later, and after the Grand Opening, Harper would admit to the Arnolds that "I am going to say this only once – I told Brian [Winslow] and everyone else that you guys would be too rushed into this with a Grand Opening date set too soon".

38.     In addition, and with respect to saleable inventory, Jimmy Taylor stated to the Arnolds during their walk-through: "Great, they left this here. Less for you to buy. Add live animals, open the doors, and you are ready for business". Jim Whitman later repeated this to the Arnolds during their "Discovery Day" visit to Petland corporate in Chillicothe.

39.     Continuing, and with respect to the amount of inventory necessary to open the store, both Jimmy Taylor (during walk-through) and Tony Neff (at Petland corporate during training week) told the Arnolds that they would only need to spend approximately $20,000 to $25,000 on increased inventory for the Grand Opening. In fact, and during the training week of March 5, 2007, and when the Arnolds expressly told Petland that even $20,000 to $25,000 was over their budget, Petland representative Tony Neff failed to tell the Arnolds that that "bare necessities" figure did not include actual pets for the store, while nevertheless implying to the Arnolds that it did.

40.     At the time these representations were made, Petland knew that they were false, or made them recklessly without knowledge of the truth.

41.     These representations and misrepresentations were made by Petland with the intention that they should be acted on by the Arnolds.

42.     The Arnolds, in fact and law, reasonably relied on the information provided by Petland, and acted upon them.

43.     The Arnolds suffered damages as a result of that reasonable reliance.

44.     By virtue of Petland's fraud, the Arnolds are entitled to rescission of the Franchise Agreement and Asset Purchase Agreement, to restitution of the money paid by them to Petland for each of the Agreements, and for their other economic and punitive damages as allowed by Ohio common law.

<strong><u>COUNT II—FRAUD IN THE INDUCEMENT</u></strong>

45.     Plaintiffs reallege and incorporate paragraphs 1 through 44 as if restated in full herein.

46.     Prior to February 28, 2007, Petland provided false, inaccurate and/or misleading information to the Arnolds with respect to the amount of money necessary to open the Marietta Petland. Specifically, Jimmy Taylor, Franchise Development of Petland met with the Arnolds for a walk-through of the store on or about the end of January, 2007, and then told them that they would only need approximately $20,000.00 to $25,000.00 of inventory to have the store ready in time for the Grand Opening.

47.     Petland also, through Jimmy Taylor, provided false, inaccurate and/or misleading information with respect to the reason the prior franchisee failed in the same venture. Specifically, Jimmy Taylor informed the Arnolds during the walk-through of the store, and on several occasions prior to that while "courting" the Arnolds, that the prior franchisee failed due to "poor management", whereas it was later learned that the previous franchisees failed because of the exact same issues experienced by the Arnolds, but which issues (described herein in detail) were concealed from them.

48.     In addition to the misrepresentations of Mr. Taylor, Petland representative Whitman had also made the same statements during the Arnolds' initial "Discovery Day" at Petland corporate. More particularly, Mr. Whitman stated to the Arnolds that the previous

franchisee was "horrible" to his customers, and that "quite frankly", he was "hard to get along with". In retrospect and hindsight, the Arnolds came to learn that the prior franchisee was only "hard to get along with" in that he asked Petland to perform its promises to him, and Petland refused and/or failed to do so.

49. Petland also provided false, inaccurate and/or misleading information with respect to the quality and merchantability of the inventory (specifically the pet food) already on the shelves of the Marietta Petland, and specifically in preparation for the Arnolds' Grand Opening. In that regard Petland representative Ryan Hamel was in charge of bringing all suppliers into the store, and ensuring for the Arnolds that the store was properly prepared and stocked for the Grand Opening.

50. Specifically, Mr. Hamel expressly told the Arnolds that "merchandising" the store was going to be an "easy job" due to the inventory already there, and on the shelves. In fact, when the Arnolds became anxious about the stocking of the store just prior to the Grand Opening, Hamel responded: "relax, we'll have it ready to go".

51. Petland further provided false, inaccurate and/or misleading information with respect to the operational status of the Marietta Petland facility. Specifically, Petland representative Jimmy Taylor repeatedly told the Arnolds, prior to opening, that the store was ready to open with just a "little bit" of inventory and pets. Again, essentially, Mr. Taylor essentially represented to the Arnolds that this franchise was a turn-key, "diamond in the rough" opportunity for them.

52. Petland, through its agents, servants, and/or employees, provided all of the above false information knowingly, and with the intent to fraudulently induce Plaintiffs into purchasing the Marietta Petland franchise.

- 17 -

53.    But for this fraudulent information, the Arnolds would not have entered into the Franchise Agreement, and the concomitant Asset Purchase Agreement, with Petland in the first instance.

54.    The Arnolds' reliance on Petland's false and fraudulent information is the direct and proximate cause of all of the Arnolds' financial harm.

55.    By virtue of Petland's fraud, the Arnolds are entitled to rescission of the Franchise Agreement and Asset Purchase Agreement, and are also entitled to restitution of the money paid by the Arnolds to Petland pursuant to those agreements, together with all other economic damages, and punitive damages, consistent with Ohio common law.

## COUNT III—BREACH OF EXPRESS CONTRACT

56.    Plaintiffs reallege and incorporate paragraphs 1 through 55 as if restated in full herein.

57.    Defendants' actions outlined above constitute breach(es) of express contract(s) between the Arnolds, and each of them, respectively.

58.    Specifically, defendant Petland breached the Franchise Agreement by failing to provide a ClubPet marketing program to the Arnolds. In this regard Petland sold the Arnolds ClubPet promotional cards for approximately $4.00 each and, in return, were supposed to mail out, on the Arnolds' behalf, monthly mailings to the franchise's customers and/or ClubPet cardholders. Instead, and within the first few months, the Arnolds learned from their own customers – who were specifically questioned by them in this regard – that those customers had not received *anything* from Petland corporate since the Arnolds' opening. When Petland was contacted in that regard, Petland representative J.R. Harper replied that the Arnolds had not forwarded, to him, a list of such customers from the store's POS system. When the Arnolds

confronted Petland that Petland otherwise seemed perfectly capable of acquiring and downloading sales information from the store's POS system nightly (when it was working), Petland had no response.

59.    Next, Petland breached its Franchise Agreement with the Arnolds by failing to provide them approximately 40 hours of "training academy sessions" at Petland's corporate facility.

60.    Specifically, approximately one-half (1/2) of the forty (40) hours of *training* time that the Arnolds were supposed to receive from Petland for running a pet store was instead spent filling out vendor applications, meeting with advertising and marketing personnel, and meeting with Tony Neff, *et al*, for completion of ordering. In fact, the entire second week of the Arnold's training was declared "unnecessary", and canceled by Petland, so that the Arnold's could instead obtain the licenses, utilities, telephones, and staff, etc., to open the store in two and one-half weeks. As stated above, this rushing of the Arnolds through their "training" was done so that they could start paying defendant Petland's lease obligation for the store starting on April 1, 2007.

61.    In addition, and in breach of both the Franchise Agreement and the Asset Purchase Agreement, and contrary to Petland's "best knowledge", the assets of the store sold to the Arnolds – for $110,500 – were knowingly *not* in "working order" when Petland sold them to plaintiffs.

62.    Specifically, none of (a) the lights serving the premises, (b) the POS system, nor (3) the kennel ventilation system were in proper working order at or by the Arnolds' Grand Opening. These systems – the very "heart" of the business – in fact never worked properly for

the Arnolds either at opening, or during the duration of the Arnolds' franchise with Petland, and despite their (the Arnolds') best efforts to fix them.

63.      By virtue of Petland's breach(es) of contract, the Arnolds are entitled to rescission of the Franchise Agreement and Asset Purchase Agreement, and are also entitled to restitution of the money paid by the Arnolds to Petland pursuant to those agreements, together with all other economic damages, and punitive damages, consistent with Ohio common law.

## COUNT IV—BREACH OF IMPLIED CONTRACT

64.      Plaintiffs reallege and incorporate paragraphs 1 through 63 as if restated in full herein.

65.      Defendants' actions outlined above constitute breach(es) of implied contract between the Arnolds, and each of them, respectively.

66.      Specifically, Petland breached its agreement(s) with the Arnolds to perform and administer its (Petland's) contracts and agreements with the Arnolds in good faith, and which obligation of good faith and fair dealing is implied in every contract in Ohio.

67.      By virtue of Petland's breach of implied contract, the Arnolds are entitled to rescission of the Franchise Agreement and Asset Purchase Agreement, and are also entitled to restitution of the money paid by the Arnolds to Petland pursuant to those agreements, together with all other economic damages, and punitive damages, consistent with Ohio common law.

## COUNT V—NEGLIGENT MISREPRESENTATION

68.      Plaintiffs reallege and incorporate paragraphs 1 through 67 as if fully stated herein.

69.     Petland and its servants, agents, and/or employees, in the course of its business, supplied false and/or misleading information to the Arnolds in the guidance of opening and running the Marietta Petland franchise.

70.     The Arnolds justifiably relied upon the information provided by Petland and its agents, servants, and/or employees.

71.     Petland and its servants, agents, and/or employees failed to exercise due care and/or competence in obtaining and/or communicating necessary information to the Arnolds regarding the opening and running of the Marietta Petland franchise.

72.     Petland and its servants, agents, and/or employees intended to influence the actions of the Arnolds, and had reason to know that the Arnolds would rely on such false and/or misleading information.

73.     By virtue of Petland's negligent misrepresentations, the Arnolds are entitled to rescission of the Franchise Agreement and Asset Purchase Agreement, and are also entitled to restitution of the money paid by the Arnolds to Petland pursuant to those agreements, together with all other economic damages, and punitive damages, consistent with Ohio common law

## COUNT VI—VIOLATION OF IMPLIED AND EXPRESS WARRANTIES OF MERCHANTABILITY AS TO DEFENDANTS HUNTE

74.     Plaintiffs reallege and incorporate paragraphs 1 through 73 as if fully stated herein.

75.     At all times material, defendants Hunte were merchants with respect to the puppies sold to the Arnolds as alleged in this Complaint.

76.     Between on or about March 2007, to September 2007, the Arnolds carried between 40-50 Hunte puppies in their store at any given time.  During the stated timeframe, the

- 21 -

Arnolds purchased well over 100 puppies of various breeds distributed by Hunte, to be sold by the Arnolds at their Marietta Petland franchise, to the public. By September 2007, however, the Arnolds quit ordering Hunte puppies due to the severe illness issues of the supplied puppies. However, and when the Arnolds failed to order Hunte puppies in September, they were immediately cut-off from Hunte's puppy tracking system, and were thus forced to start ordering puppies from Hunte again as they (the Arnolds) had no alternative puppy tracking system to use, or in place.

77. Hunte expressly warranted to Plaintiffs that the puppies were healthy, and would be suitable for sale to the public (Exhibit C).

78. Hunte impliedly warranted to Plaintiffs that the puppies were of merchantable quality, and fit for the ordinary purposes for which puppies are sold to the public.

79. In connection with the sale of puppies to the Arnolds, Hunte knew the particular purpose for which the puppies were intended, knew that Arnolds were relying on Hunte's skill and judgment to furnish suitable and healthy puppies, and thereby impliedly warranted that the puppies Hunte supplied to the Arnolds would be fit for their sale to the public.

80. Approximately 38, or 82%, of the initial 46 Hunte puppies ordered for the Grand Opening were sick when they arrived from Hunte, or shortly thereafter, and all requiring antibiotics, cough syrup, breathing treatments, and/or ear cleanings, and with 3 puppies thereafter actually dying of parvo and/or viral interitis. Because of this, those 2 dead Hunte puppies were returned to the Arnolds for full refunds, plus veterinarian costs.

81. Specifically, the Arnolds' very first veterinarian bill was exponentially larger than that projected, and previously disclosed and shown to them by Petland, as being representative for the store on Petland's financial statements. This was *despite* the fact that Hunte *did*

reimburse the Arnolds for the cost of the dead dogs, but would not reimburse the Arnolds for the costs of nursing the puppies back to health either on-premises, or at the veterinarian's office.

82.     In fact, and immediately after the death of the third puppy, the Arnolds' veterinarian, Dr. David Spindler, insisted that the Arnolds cease selling puppies until the incubation period of/for Parvo passed for all of the other puppies in the (inadequately ventilated) kennel.  This was deemed absolutely necessary to (a) keep any of the Arnolds' future customers from suffering the loss of a loved one (as, according to Hunte, people tend to bond with their new puppies very quickly), and (b) to try and save the Arnolds' then already fragile business reputation in the community.  Inevitably, however, the defective puppies proximately caused the failure of the Arnolds' Marietta Petland franchise *in toto*.

83.     For all intents and purposes of/for the franchise, the puppies supplied by Hunte to the Arnolds, for sale to the public, were unmerchantable and, in some cases, worthless to them.

84.     By virtue of Hunte's breach of express and implied warranties, the Arnolds are entitled to economic damages, and punitive damages from Hunte, consistent with Ohio common law.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

  a) Rescind the Franchise Agreement and Asset Purchase Agreement between the Arnolds and Petland;

  b) Return to Plaintiffs any and all franchise fees, royalties, rent, purchase moneys, and/or other fees imposed by Petland, and/or other costs the Arnolds expended in furtherance of opening and operating the Marietta Petland;

c) Enter judgment in favor of the Arnolds and against Petland and Hunte for compensatory damages in an amount in excess of $75,000.00, to be proven at trial, together with costs, prejudgment interest, and postjudgment interest;

d) Enter judgment against Petland and Hunte for punitive damages, and attorney fees; and

e) Award any additional relief deemed just and appropriate.

Respectfully submitted,

GREGORY H. MELICK (OH #0065694)
(gregmelick@themelicklawfirm.com)
HEATHER L. MELICK (OH #0068756)
(heathermelick@themelicklawfirm.com)

THE MELICK LAW FIRM, LLC
590 Arborside Lane
Suite 100
Avon Lake, OH 44012
Telephone:     (440) 930-5811
Cell Phone:    (216) 324-3042
Facsimile:     (440) 348-2347

***Attorneys for Plaintiffs Lucinda S. Arnold and Fred J. Arnold***

- 24 -